**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

v.

CHRISTOPHER ORTEGA,

Defendant.

Case No. 25-CR-4750-MIS-4

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER is before the Court on the Government's Proposed Findings of Fact and Conclusions of Law, ECF No. 339, and Defendant's Request for Special Findings of Fact, ECF No. 338, following the bench trial held in this case from August 19 to 21, 2026, see ECF No. 335. The Court herein sets forth its findings of fact and conclusions of law. To the extent the findings of fact are supported by a citation to the trial transcript, the Court finds the witness(es) testifying as to that fact to be credible.

## I. FINDINGS OF FACT

1. In March or April of 2025, Obed Lopez was recruited by a man to permit thefts of crude oil from Plains All American Pipeline (PAAP). Lopez agreed to assist in these thefts and recruited Samuel Cardona, who recruited German Ortiz. Lopez, Cardona, and Ortiz are hereinafter referred to as the PAAP Employees. Tr. of Trial – 1, pp. 47-49, 50-52.
2. The thefts always occurred in the same general manner. Lopez was contacted and informed that a driver was ready. Lopez then informed Cardona and Ortiz, who identified a meeting time and location. A white vacuum tanker met them at a location on the PAAP pipeline. Cardona and Ortiz permitted and assisted the men operating the white vacuum tanker to connect to the

pipeline and remove crude oil directly from the pipeline. Tr. of Trial – 1, pp. 49-52, 62-65; Tr. of Trial – 1, pp. 69, 75. See also Exhibits 4-6 and 70-75.

3. High quality or pure oil has a Basic Sediment and Water (BS&W) percentage under 1.0%. The white vacuum tanker would take approximately 130 barrels of oil per load. Tr. of Trial – 1, pp. 29, 32, 35, 37, 44; Tr. of Trial – 2, pp. 97–98; Tr. of Trial – 3, p. 84.
4. The same vacuum tanker was used for each theft. The vacuum tanker was marked with “MIS LLC” on the doors. Tr. of Trial – 1, p. 64; Tr. of Trial – 2, pp. 64–65. See also Exhibits 35-37.
5. These thefts occurred in New Mexico. Tr. of Trial – 1, p. 53.
6. After the oil thefts, the MIS LLC vacuum tanker was repeatedly observed (visibly by agents and by means of electronic tracking devices) traveling back to a yard located at 4154 7 Rivers Highway, Carlsbad, Eddy County, New Mexico (7 Rivers yard). Tr. of Trial – 2, pp. 63–65, 67-68, 74–77.
7. Agents repeatedly observed the MIS LLC vacuum tanker connect to one of the three frac tanks at the 7 Rivers yard. The MIS LLC vacuum tanker appeared to be delivering the stolen oil to the 7 Rivers yard. Tr. of Trial – 1, p. 85-88, 93-95; and Tr. of Trial – 2, pp. 65–68, 73–74. See also Exhibits 9–13.
8. The agents observed oil haulers connect to the same frac tanks and appear to draw oil from the frac tanks. Tr. of Trial – 1, pp. 97-99, Tr. of Trial – 2, p. 70. See also Exhibits 7–8.
9. On July 25, 2025, two oil haulers were followed taking oil from the 7 Rivers yard. The oil haulers drove from Carlsbad, New Mexico to a LACT station near Pecos, Texas. They were observed hooking up to a LACT station and appeared to deliver crude oil. LACT stations only accept crude oil with low BS&W. Tr. of Trial – 1, pp.35-37; Tr. of Trial – 2, pp. 5–10; 70–72. See also Exhibits 41–42.

10. The 7 Rivers yard was operated by Hound Dog Energy (HDE). HDE had one founding member, Thomas Rees. Tr. of Trial – 2, pp. 64, 136; Tr. of Trial – 3, pp. 7–9. See also Exhibits 54, 56, and 59.
11. Between March 12, 2025, and April 23, 2025, HDE received approximately $180,800.00 from two businesses, Big Striker Energy and Big Hog Energy.[1] Tr. of Trial – 3, p. 15-20. See also Exhibits 55 – 58 and 76.
12. The financial records for both of these businesses indicate that they are controlled by Maxwell Sterling Jensen. Tr. of Trial – 3, pp. 9–14, 18. See also Exhibits 61–64.
13. Jensen and Rees are "best friends." Rees had no knowledge of the oil business before he started working for Jensen. It was Jensen's idea to establish HDE. Jensen used HDE to operate an oil business without Jensen's name being openly connected with the business. The initial yard for HDE was south of Carlsbad. Tr. of Trial – 3, pp. 36, 41–44. See also Exhibits 44 and 44a, pp. 21, 23.
14. Jensen was arrested. Rees shutdown the HDE yard south of Carlsbad and temporarily left the state of New Mexico. Tr. of Trial – 2, p. 55; Tr. of Trial – 3, pp. 43–44, 89. See also Exhibits 44, 44a, p. 22.
15. Jensen was released on pretrial conditions. Rees returned to New Mexico and opened the 7 Rivers yard. Tr. of Trial – 2, p. 55; Tr. of Trial – 3, pp. 43–44. See also Exhibits 44, 44a, p. 22
16. As previously noted, Jensen supplied funding for HDE. Jensen also provided frac tanks for HDE. Tr. of Trial – 2, pp. 43–46, 49; Tr. of Trial – 3, pp. 16–20. See also Exhibits 33, p. 4, 33, p. 10 and 52, p. 1; Exhibit 76, p. 20.

[1] An additional $15,000.00 payment was made by Big Striker Energy on June 18, 2025.

17. In June of 2025, Jensen contacted Christopher Ortega based on Ortega's resume on Indeed and told him about an open yard manager position. Tr. of Trial – 3, pp. 57–58, 93. Exhibits 44 and 44a, pp. 2–3.
18. Jensen interviewed Ortega and then recommended Ortega meet with Rees. Rees hired and trained Ortega to operate the 7 Rivers yard. Tr. of Trial – 3, p. 57-58. Exhibits 44 and 44a, pp. 2-3.
19. Ortega had experience in the oil business, having previously worked as a pumper for three and a half years. With this experience, Ortega could recognize "good" oil from "bad" oil. Tr. of Trial – 3, pp. 53-54, 74. <u>See also</u> Exhibits 44 and 44a, pp. 16-21.
20. Ortega started working on or about June 22, 2025. After a few weeks, Rees left New Mexico and Ortega was responsible for the daily operation of the 7 Rivers yard. During the time Ortega worked for HDE, he was its sole employee. Tr. of Trial – 3, pp. 58 and 74-75. <u>See also</u> Exhibits 44, 44a, p. 13.
21. Ortega documented every load of oil that entered and left the 7 Rivers yard, creating load tickets for the incoming oil. Tr. of Trial – 3, pp. 61 and 76. <u>See also</u> Exhibits 44 and 44a, p. 2.
22. Ortega was aware that over 90% of the oil coming into the 7 Rivers yard was from the MIS LLC vacuum tanker, which was operated by Carlos Contreras. Tr. of Trial – 2, pp. 121 125; Tr. of Trial – 3, pp. 61–62 and 76.
23. Ortega received load tickets for every outgoing load of oil. He witnessed the oil haulers test the oil before they accepted the oil. Tr. of Trial – 2, pp. 102–103. Tr. of Trial – 3, p. 62. Exhibits 44 and 44a, pp. 15–16.

24. Ortega knew that HDE did nothing to purify the oil. Thus, Ortega knew that the oil coming into the yard and going out of the yard was extremely low in BS&W. Tr. of Trial – 3, pp. 78–79.

25. The HDE load tickets document the following information related to July 30, 2025:[2]

| Ticket # | Date/Time | Transport | Driver | Total Bbls: | BS&W | Operator |
|---|---|---|---|---|---|---|
| 148 | 7/30/2025 at ___ hours | MIS LLC | Carlos | 131 | .1 | Chris |
| 148 | 7/30/2025 at 1800 hours | MIS LLC | Carlos | 139 | .1 | Chris |
| 148 | 7/30/2025 at ___ hours | MIS LLC | Carlos | 141 | .1 | Chris |

These load tickets are Exhibit 49, pp. 5 – 7; see also Tr. of Trial – 2, pp. 82–83, 122–124.

26. The HDE load tickets document the following information related to August 21, 2025:[3]

| Ticket # | Date/Time | Transport | Driver | Total Bbls: | BS&W | Operator |
|---|---|---|---|---|---|---|
| 183 | 8/21/2025 at 1000 hours | MIS | Carlos | 138 | .1 | Chris |
| 184 | 8/21/2025 at 1330 hours | MIS | Carlos | 143 | .1 | Chris |

These load tickets are Exhibit 49, pp. 40 and 41.

27. In the summer of 2025, the market value for crude oil with a low BS&W was approximately $67 to $68 per barrel according to the West Texas Intermediate. Tr. of Trial – 1, p. 37. Thus, on July 30, 2025, HDE received over $27,000.00 worth of stolen crude oil. On August 21, 2025, HDE received over $18,000.00 worth of crude oil.

28. Load tickets from 9G Energy document that oil was picked up from HDE at the 7 Rivers yard and transported into Texas. Tr. of Trial – 3, pp. 62, 79-80. Exhibit 50. See also Exhibits 44, 44a, p. 14.

[2] Count 5 of the Superseding Grand Jury Indictment alleges that Christopher Ortega aided and abetted in the transportation of stolen good in interstate commerce on July 30, 2025.

[3] Count 9 of the Superseding Grand Jury Indictment alleges that Christopher Ortega aided and abetted in the transportation of stolen good in interstate commerce on August 21, 2025.

29. These tickets document the following:

| Date | Gross Barrels | BS&W | Destination |
|---|---|---|---|
| 7/26/2025 | 83.80 | 0.1 | Andrews, TX |
| 7/26/2025 | 97.00 | 0.1 | Andrews, TX |
| 7/26/2025 | 182 | 1 | Andrews, TX |
| 7/29/2025 | 172.84 | 0.1 | Andrews, TX |
| 7/31/2025 | 195.5 (net) | | |
| 7/31/2025 | 60 | 0.1 | Andrews, TX |
| 7/31/2025 | 130.3 | 0.1 | Andrews, TX |
| 7/31/2025 | 190 | 0.1 | Andrews, TX |
| 8/1/2025 | 192 | 0.1 | Martin, TX |
| 8/1/2025 | 190 | 0.1 | Andrews, TX |
| 8/2/2025 | 196 | 0.1 | |
| 8/2/2025 | 190 | 0.1 | Andrews, TX |
| 8/7/2025 | 190.3 (net) | | |
| 8/7/2025 | 170 | 0.1 | Andrews, TX |
| 8/8/2025 | 5 | 1 | Martin, TX |
| 8/8/2025 | 28.6 | 0.1 | Martin, TX |
| 8/9/2025 | 190 | 0.1 | Andrews, TX |
| 8/9/2025 | 195.3 | 0.1 | Andrews, TX |
| 8/12/2025 | 185 | 0.1 | Martin, TX |
| 8/12/2025 | 191.3 | 0.1 | Martin, TX |
| 8/13/2025 | 190 | 0.1 | Martin, TX |
| 8/13/2025 | 194.2 | 0.5 | Andrews, TX |
| 8/14/2025 | 183 | 0.1 | Martin, TX |
| 8/14/2025 | 194.2 | 0.1 | Martin, TX |
| 8/14/2025 | 193.2 | 0.5 | Martin, TX |
| 8/15/2025 | 192.2 | 0.1 | Andrews, TX |
| 8/16/2025 | 192.2 | 0.1 | Andrews, TX |
| 8/17/2025 | 190 | 0.1 | Andrews, TX |
| 8/19/2025 | 30 | 0.1 | Andrews, TX |
| 8/19/2025 | 90 | | Andrews, TX |

Exhibit 50.

30. According to the load tickets, from June 24, 2025, to August 19, 2025, Caribou Energy / 9G transported approximately 4,684.24 barrels from the 7 Rivers yard to Texas and paid HDE $362,873. Tr. of Trial – 3, p. 19. See also Exhibits 50, 55 – 58 and 76.

31. Ortega was aware that HDE was paying Contreras $35 for each barrel of oil that he delivered. Furthermore, he was aware that within hours, or at most a few days, HDE sold that oil for $55 to $65 per barrel. Tr. of Trial – 2, p. 99; Tr. of Trial – 3, pp. 79–81. See also Exhibits 44 and 44a, p. 7.

32. On August 21, 2025, Ortega and Rees met with Stuart Dollar, who managed Jensen's oil yard in Odessa, Texas. Tr. of Trial – 2, pp. 11–14, 17, 47–50; Tr. of Trial – 3. pp. 45–47, and 89–90. See also Exhibit 34 and 34a, p. 13.

33. Dollar claimed to have a source of oil, known as "Hugo," that was going to deliver 180 barrels of oil that day. Dollar claimed that the source was a friend of someone who worked for Diamondback. Diamondback is an oil company. Tr. of Trial – 2, pp. 38, 47, 52. See also Exhibit 34 and 34a, pp. 1–3.

34. Rees, Ortega and Dollar talked about not looking like a "Fed" (federal agent) when Hugo arrived. Tr. of Trial – 2, pp. 40–41; Tr. of Trial – 3, pp. 47-49.

35. Ortega acknowledged that he knew about Jensen's arrest for illegal oil transportation. Additionally, he recognized that this arrest was the reason that people did not want to deliver oil to his yard in Odessa. Tr. of Trial – 2, pp. 52–55; Tr. of Trial – 3, pp. 44–47. See also Exhibits 34 and 34a, pp. 7-8; 44 and 44a, pp. 21–22.

36. Rees and Ortega were each aware of a high probability that Dollar's oil was stolen. Ortega shared his suspicions with Rees, who advised him to continue writing tickets for the oil that Contreras brought to the 7 Rivers yard. Despite this awareness, Ortega indicated his willingness to accept the oil. Tr. of Trial – 2, pp. 40-41, 52-55, 108–110, Tr. of Trial – 3, pp.47-49, 80-85.

37. Ortega recognized that Jensen was actively participating in running the HDE business. Tr. of Trial – 2, pp. 101–102, 112; Tr. of Trial – 3, pp. 89–91. See also Exhibit 44 and 44a, pp. 12, 21-22.

38. After his arrest, Ortega voluntarily waived his right to remain silent and to counsel. He submitted to an interview by law enforcement. Tr. of Trial – 2, pp. 95–96; Tr. of Trial – 3, pp. 70–71. See Exhibit 44 and 44a, p. 1.

39. In this interview, Ortega repeatedly stated that he recognized that the oil being brought in by Contreras was too pure (low in BS&W) and in too great of volume to come from waste oil. With this knowledge, Ortega continued to work at the 7 Rivers yard, accepting loads of oil from Contreras and permitting 9G to purchase loads for transport to Texas. Tr. of Trial – 2, pp. 96–99, 105–106, 111; Tr. of Trial – 3, pp. 87-88. See also Exhibit 44 and 44a, pp. 23–26, 38.

40. Likewise, on cross examination, Ortega admitted that on or about August 11, 2025, he knew that there was a high likelihood that the oil brought into the 7 Rivers yard by Contreras was stolen. With this knowledge, Ortega continued to work at the 7 Rivers yard, accepting loads of oil from Contreras and permitting 9G to purchase loads for transport to Texas. Tr. of Trial – 3, p. 85-88. The oil brought into the 7 Rivers yard after this date was transported to Texas and was valued well in excess of $5,000.00. See id. at 88 (stating that on August 11, 12, and 13 Contreras brought approximately 1,000 barrels of oil to 7 Rivers yard); Tr. of Trial – 1, p. 37 (stating that in the summer of 2025 crude oil was valued at $67 to $68 per barrel); Exhibit 76 (showing that between August 11 and 19, 2025, 9G paid made three payments to HDE totaling $170,213).

## II. CONCLUSIONS OF LAW

Per the Tenth Circuit Pattern Jury Instructions Criminal 2.82 (2011), in order for Mr. Christopher Ortega to be found guilty of Interstate Transportation of Stolen Goods contrary to 18 U.S.C. §§ 2314 and 2, as charged in Counts 5 and 9 of the Superseding Grand Jury Indictment [ECF No. 111], the United States must prove beyond a reasonable doubt that:

First: he caused to be transported in interstate commerce stolen crude oil;

Second: at the time of such transportation, the defendant knew that the crude oil had been stolen; and

Third: the crude oil had a value of $5,000 or more.

Tenth Circuit Pattern Jury Instructions Criminal 2.82 (2021 Ed., Updated Apr. 2, 2021).

Ortega was charged as having aided or abetted in the interstate transportation of the stolen crude oil. "Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2. The United States must prove that (1) every element of the charged crime was committed by someone other than the defendant and that (2) the defendant intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about. This means that the Government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him. Tenth Circuit Pattern Jury Instructions Criminal 2.06 (2021 Ed., Updated Apr. 2, 2021).

Per the Tenth Circuit Pattern Jury Instructions Criminal 1.37 (2021 Ed., Updated Apr. 2, 2021), when the word "knowingly" is used in these charges, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. Although knowledge on the

part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. Knowledge can be inferred if the defendant was aware of a high probability that the crude oil was stolen or unlawfully possessed, unless the defendant did not actually believe that the crude oil was stolen or unlawfully possessed.

Per the Tenth Circuit Pattern Jury Instructions Criminal 2.19.1 (2011) in order for Ortega to be found guilty of Conspiracy to Commit Interstate Transportation of Stolen Goods contrary to 18 U.S.C. § 371, as charged in Count 1 of the Superseding Grand Jury Indictment [ECF No. 111], the United States must prove beyond a reasonable doubt that:

First: the defendant agreed with at least one other person to violate the law;

Second: one of the conspirators engaged in at least one overt act furthering the conspiracy's objective;

Third: the defendant knew the essential objective of the conspiracy;

Fourth: the defendant knowingly and voluntarily participated in the conspiracy; and

Fifth: there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

The United States proved, beyond a reasonable doubt, that:

1. Between April and August of 2025, Carlos Contreras repeatedly and consistently stole high-quality oil from PAAP using the white vacuum truck with the marking "MIS LLC";

2. These thefts occurred several times a week and often repeatedly on a single day;

3. This stolen oil was repeatedly and consistently delivered to HDE's 7 Rivers yard;

4. The PAAP pipelines and the 7 Rivers yard are in New Mexico;

5. The stolen oil was then repeatedly and consistently sold to 9G Energy and transported interstate into Texas;

6. According to the load tickets, from June 24, 2025 to August 19, 2025, Caribou Energy / 9G transported approximately 4,684.24 barrels from the 7 Rivers yard to Texas and paid HDE $362,873;

7. On July 30, 2025, HDE received 411 barrels of stolen oil from Contreras. In the summer of 2025, the market value for crude oil with a low BS&W was approximately $67 to $68 per barrel according to the West Texas Intermediate. Thus, on July 30, 2025, HDE received over $27,000.00 worth of stolen crude oil. This oil was quickly sold and transported to Texas;

8. On August 21, 2025, HDE received 281 barrels of stolen oil from Contreras. Thus, on August 21, 2025, HDE received over $18,000.00 worth of stolen crude oil;

9. Ortega was the sole employee for HDE and worked there from on or about June 22 to his arrest on August 21, 2025; during that time he was responsible for the daily operation for HDE's 7 Rivers yard, including documenting each load of oil that entered and left the yard;

10. Ortega was aware that Maxwell Jensen was actively involved in the management of HDE;

11. Ortega was aware that Maxwell Jensen had been arrested and was on conditions of release for charges involving illegal oil transportation;

12. During his employment, Ortega became aware that the oil being brought in by Contreras and sold to 9G Energy, was not waste oil and was, in fact, stolen;

13. Ortega continued to work at HDE, accepting loads of stolen oil from Contreras and assisting in the sales of the stolen oil to 9G Energy. Every load of contraband accepted by Ortega during the charged dates exceeded $5,000 in value, satisfying § 2314's jurisdictional threshold;

14. By documenting incoming loads, preparing outgoing load tickets, coordinating directly with 9G Energy haulers, and maintaining the yard's operational readiness, Ortega performed acts that were a substantial factor in causing the stolen oil to be transported from New Mexico to Texas. His conduct satisfies the 'caused to be transported' element under § 2314."

15. Ortega's knowledge that the oil was stolen, coupled with his repeated assistance in receiving, staging, and selling it for interstate transport, shows that he intentionally associated himself with the unlawful venture and sought its success. His continued participation—despite acknowledging the oil was too pure, too consistent, and too valuable to be waste oil—demonstrates the required intent;

16. Even if Ortega claimed not to know the oil was stolen, the evidence establishes deliberate avoidance. Ortega recognized MIS's tanker consistently delivered high-quality and unusually large volumes of oil; he knew HDE performed no purification; and he acknowledged the prices paid and charged were inconsistent with lawful market rates. These facts establish awareness of a high probability the oil was stolen, and no evidence shows he actually believed otherwise; and

17. The United States proved an agreement—tacit or express—between Ortega, Contreras, Rees, and Jensen to receive stolen oil at HDE, consolidate it, and sell it to 9G Energy for interstate transport. Conspiratorial agreement may be inferred from coordinated actions, shared economic interests, and Ortega's admissions regarding Jensen's role. The repeated deliveries, consistent pricing, and continuous interstate sales demonstrate concerted activity amounting to an agreement.

18. Taken together, the coordinated thefts, Ortega's knowledge and active participation, the interstate movement of stolen oil exceeding $5,000 per load, and the participants' interdependence satisfy every element of Counts 1, 5, and 9 beyond a reasonable doubt. Christopher Ortega is guilty of Count 1 of the Superseding Grand Jury Indictment, to wit: Conspiracy to commit Interstate

Transportation of Stolen Goods contrary to 18 U.S.C. § 371; and Counts 5 and 9, to wit: Interstate Transportation of Stolen Goods contrary to 18 U.S.C. §§ 2314 and 2. ECF No. 111.

Margaret Strickland

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE